SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
_____

ALPHAMEDICA, INC.,

                              Plaintiff,

            - against -

MICHAEL K. FAUST,

                              Defendant.
_____

Index No.: 4887-07

**SUMMONS**

Plaintiff designates Westchester County as the place for trial

The basis for venue is that Plaintiff resides in Westchester County

**RECEIVED**
MAR 2 2 2007
TIMOTHY C. IDONI
COUNTY CLERK
COUNTY OF WESTCHESTER

**TO THE ABOVE NAMED DEFENDANT:**

**YOU ARE HEREBY SUMMONED** to answer the Complaint in this action, or to serve

a notice of appearance, if the Complaint is not served with this Summons, within twenty (20)

days after the service of this Summons, exclusive of the day of service, or within thirty (30) days

after service if this Summons is not personally delivered to you within the State of New York. In

case of your failure to appear or answer, judgment will be taken against you by default for the

relief demanded in the Complaint.

Dated: New York, New York
       March 21, 2007

WOLLMUTH MAHER & DEUTSCH LLP

By: _____
        David H. Wollmuth
        Stuart Kagen
        Jennifer L. Rudolph

        500 Fifth Avenue
        New York, New York 10110
        Tel:  (212) 382-3300
        Fax:  (212) 382-0050

        *Attorneys for Plaintiffs*

**TO:**

Michael Faust
12 Ivy Place
Upper Saddle River, New Jersey 07458

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

ALPHAMEDICA, INC.,

Index No.: 498757

                          Plaintiff,

          - against -                     COMPLAINT

MICHAEL K. FAUST,

                          Defendant.

Plaintiff AlphaMedica Inc. ("AlphaMedica"), by its undersigned counsel, for its

Complaint against Defendant Michael K. Faust ("Faust" or "Defendant"), allege upon

knowledge with respect to their own actions and upon information and belief as to all other

matters as follows:

### Nature of the Action

1.      This is an action for injunctive relief and damages arising from the breach

and threatened breach of Faust's fiduciary duties arising from his prior service as AlphaMedica's

Chief Executive Officer, the Shareholders' Agreement of AlphaMedica, as amended, to which he

is a party with, among others, AlphaMedica, and the breach of his fiduciary duties owed as the

former Chief Executive Officer of AlphaMedica, breach of contract, and Faust's tortious

interference with AlphaMedica's contractual relations with several of its key clients.

### Parties

2.      Plaintiff AlphaMedica is a corporation organized under the laws of the

State of Delaware, with its principal place of business in Tarrytown, New York. AlphaMedica

provides leading pharmaceutical companies with a wide array of marketing and promotional

communication services, including journal advertising, direct mail, educational programs,

promotional and sales incentive videos, and Website development.

3.    Upon information and belief, Defendant Michael Faust is a resident of the State of New Jersey and conducts business in New York.

### Jurisdiction and Venue

4.    This Court has subject matter jurisdiction of this action pursuant to New York Judiciary Law §140-b, which provides that the Supreme Court has general jurisdiction.

5.    Upon information and belief, Defendant Faust transacts business within the State of New York.  Further, Defendant Faust also has committed tortious acts within the State of New York affecting AlphaMedica.

6.    By virtue of the foregoing, this Court has jurisdiction over Faust under CPLR § 302(a)(1) and CPLR § 302(a)(2).

7.    Venue is proper in this County pursuant to CPLR § 509 because Plaintiff has designated this County for trial and because AlphaMedica is a resident of Westchester County pursuant to CPLR § 503(a).

A.    **Background**

8.    AlphaMedica is a closely held private company.

9.    In or about July 1999, Faust, and other shareholders at the time, including, current shareholders Andrew Galler ("Galler"), Kelli A. Mooney ("Mooney") and Kerri Riccardo ("Riccardo") entered into a Shareholders' Agreement, entitled Shareholders' Agreement of AlphaMedica.  A true and correct copy of the Shareholders' Agreement of AlphaMedica, Inc. made as of July 1, 1999, as amended (the "Shareholders' Agreement"), is annexed hereto as Exhibit A.

10.    Since in or about 1999, AlphaMedica has operated with a Board of

2

Directors comprised of at least three shareholder members, with Galler acting as Secretary, Mooney acting as President, and up until March 20, 2007, Faust acting as Chairman of the Board and Chief Executive Officer.

       11.    In June 2001, the Shareholders' Agreement was amended to add the following as shareholders of AlphaMedica: (i) Michael Kroha ("Kroha"); (ii) Christine Manning ("Manning"); and (iii) William Stroemer ("Stroemer"). See Exhibit A hereto.

       12.    In addition to being shareholders of AlphaMedica, Kroha, Manning, Riccardo and Stroemer also act as employees of AlphaMedica.

       13.    Faust is currently a member of the Board of Directors of AlphaMedica and a shareholder of AlphaMedica.

**B.    The Shareholders' Agreement**

       14.    Defendant Faust is a party to the Shareholders' Agreement.

       15.    Plaintiff AlphaMedica is also a party to the Shareholders' Agreement.

       16.    Under Paragraph 6(c) of the Shareholders' Agreement, Faust agreed "both during his … employment and after termination thereof … not [to] do any act which is intentionally detrimental to the reputation of the Company or any of its Affiliates, such as making derogatory or disparaging remarks about the Company or its Affiliates or their employees." See Exhibit A at ¶6(c).

       17.    Paragraph 6(c) of the Shareholders' Agreement further provides that "each Shareholder will not reveal or use confidential or proprietary information about the Company, or any of its Affiliates[1] or its clients obtained by the holder while an employee." See id.

       18.    In addition, Paragraph 6(d) of the Shareholders' Agreement provides that

---

[1] "Affiliate" is defined by Section 6(e) to mean, in part, "any partnership, corporation, association, trust, unincorporated organization or other entity ("Entity") that directly or indirectly controls, is controlled by or is under common control with an Entity."

"Any breach or threatened breach of any of the covenants in this Section 6 will cause irreparable injury and incalculable damage to the Company or an Affiliate thereof and the Company and such Affiliate shall accordingly be entitled to apply for and obtain injunctive relief for the same in any court of competent jurisdiction in addition to all other remedies which might be available to it or them and each Shareholder agrees not to raise in any such action the defense that plaintiff may have an adequate remedy at law." See Exhibit A at ¶6(d).

C.    **Faust's Service and Resignation at AlphaMedica**

19.    During Faust's tenure as Chief Executive Officer of AlphaMedica, he was one of AlphaMedica's primary officers, and charged with the responsibility of running many of the day-to-day operations of AlphaMedica, including maintaining AlphaMedica's financial books and records.

20.    In this capacity, Faust had direct contact with managers at one of AlphaMedica's key clients, Allergan Inc., and was privy to information regarding others, such as Pfizer Inc.

21.    Faust also reviewed contracts, budgets, financial reconciliations, and other sensitive internal AlphaMedica documents regarding its revenues, profits and ongoing business relations with its clients.

22.    Faust traditionally used his position of influence as Chief Executive Officer to speak separately with the officers and shareholders of AlphaMedica, and other key executives, in an apparent effort to divide them against each other and to retain his power within AlphaMedica.

23.    In or about January 2007, Faust began an attempt to drive Galler out of AlphaMedica altogether and to force him to sell his shares. Faust continued in this effort, to

4

AlphaMedica's detriment, over the course of several months.

24.     The majority of AlphaMedica's shareholders did not wish to see Galler leave AlphaMedica, nor did they wish to purchase Galler's shares so that he would depart.

25.     Faust was very displeased with this result. He set forth an ultimatum. He demanded that Galler be forced to leave his position at AlphaMedica and that this was the best option for AlphaMedica to continue its business growth. If this position were not accepted, Faust threatened to resign from AlphaMedica.

26.     AlphaMedica and its other shareholders refused to drive Galler out of the business.

27.     Thereafter, Faust, on multiple occasions, informed Galler and Mooney, and others within AlphaMedica, of his desire to resign from AlphaMedica as its Chief Executive Officer.

28.     Consistent with their duties as members of the Board of Directors and shareholders of AlphaMedica, Galler and Mooney had no choice but to take seriously Mr. Faust's communications that he wanted to resign as Chief Executive Officer of AlphaMedica.

29.     Upon information and belief, Faust, however, did not believe that AlphaMedica would accept his resignation.

30.     On March 20, 2007, at a duly noticed and convened telephonic meeting of all members of the Board of Directors, myself and Ms. Mooney, constituting a majority of the Board of Directors, voted and resolved to, among other things: (i) accept the resignation of Faust as Chief Executive Officer of AlphaMedica, Inc., effective immediately; and (ii) consider the appointment of Mr. Faust as a consultant of AlphaMedica during this transitional period.

31.     Following the March 20, 2007 meeting of the Board of Directors, Mooney

and Galler contacted all of their fellow shareholders present at AlphaMedica's principal office,
including Manning, Stroemer and Riccardo, to inform them of the Board of Directors'
acceptance of Faust's resignation as Chief Executive Officer of AlphaMedica.

32.     At approximately 8:00 p.m., Mooney, Galler, Stroemer and Riccardo,
telephoned Kroha in order to inform him of the Board of Directors' acceptance of Faust's
resignation.  Mr. Kroha, at the time, was traveling on behalf of AlphaMedica in London,
England.

33.     Upon information and belief, during the shareholders' telephone call with
Kroha, Faust, who also happened to be traveling with Kroha, entered the room where Kroha was
participating in the telephone call and wrested the telephone away from Mr. Kroha.

34.     Upon wresting the telephone away from Kroha, Faust did not provide
Galler, Mooney, Riccardo or Stroemer with an opportunity to identify all of the participants on
the telephone call, and instated stated to Mooney via speaker – for all participants to hear – that
Faust was going to take actions to destroy the integrity and reputation of AlphaMedica, as well
as the integrity and reputation of certain of its shareholders.

35.     During the course of that call, Faust threatened to, among other things,
take the following actions:

> (i)     to destroy AlphaMedica's continuing business and relationship with a
> pharmaceutical company known as Pfizer Inc. – which relationship is
> based on ongoing contractual dealings and which has current revenue
> impact to AlphaMedica of several million dollars;

> (ii)    to destroy AlphaMedica's continuing business and relationship with a
> pharmaceutical company known as Allergan Inc. – which relationship

is based on ongoing contractual dealings.  This relationship is also worth several million dollars in revenues to AlphaMedica;

(iii)    to ruin the careers of Mooney, Galler and Stroemer by destroying their reputations, good names and integrity; and

(iv)    to use AlphaMedica's confidential and private business information against the company to drive it into the ground.

36.    Faust's threats during the telephone call were not simply hypothetical.

37.    To the contrary, he indicated that he already taken steps to destroy AlphaMedica's relationships and business with Pfizer and specifically stated that "someone at Pfizer loves [him] very much and they would do anything for [him]."

38.    Upon information and belief, in or about the same time, Faust also directed an employee of AlphaMedica to physically take the laptop computer that AlphaMedica paid for and owns and assigned to him, and to covertly place that computer in that employee's car.  Faust did not mention this to any of the other shareholders.  Nor did he disclose that he directed this act subsequent to any other AlphaMedica officer or director.

39.    Upon information and belief, the computer contains numerous confidential electronic files and other materials belonging to AlphaMedica.

40.    Upon information and belief, Faust and/or someone acting on his behalf, is now is in possession, custody or control of that computer, which was apparently taken from AlphaMedica's premises late on the night of March 20, 2007, after business hours.

41.    Upon information and belief, Faust now possesses confidential trade secret AlphaMedica information that is critical to its business, which Faust has threatened to use all of in order to damage AlphaMedica and its business relationships and to try to end the careers of his

7

fellow AlphaMedica shareholders.

### Breach of Contract

42.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 42 as if set forth herein.

43.    Defendant Faust is a party to the Shareholders' Agreement.

44.    Plaintiff AlphaMedica is also a party to the Shareholder Agreement.

45.    Under Paragraph 6(c) of the Shareholders' Agreement, Faust agreed "both during his ... employment and after termination thereof ... not [to] do any act which is intentionally detrimental to the reputation of the Company or any of its Affiliates, such as making derogatory or disparaging remarks about the Company or its Affiliates or their employees." See Exhibit A at ¶6(c).

46.    Faust has breached the covenants contained in Paragraph 6(c) of the Shareholders' Agreement, by, among other things: (a) stating on March 20, 2007 to the shareholders of AlphaMedica that he was going to "destroy" AlphaMedica; (b) by threatening to "ruin" AlphaMedica's business relationship with Pfizer Inc. – a relationship that generates several million dollars for AlphaMedica annually – by using the information and contacts that he possesses; (c) by threatening to "ruin" AlphaMedica's business relationship with Allergan Inc., another significant client of AlphaMedica; and by (d) threatening to "destroy" the businesses and careers of fellow shareholders Galler, Mooney and Stroemer.

47.    Paragraph 6(c) of the Shareholders' Agreement further provides that "each Shareholder will not reveal or use confidential or proprietary information about the Company, or

any of its Affiliates[2] or its clients obtained by the holder while an employee." See id.

48.    Faust has breached the covenant contained in Paragraph 6(c) of the Shareholders' Agreement by, among other things: (a) threatening the other shareholders that he would use the knowledge and business relationship he had developed as AlphaMedica's Chief Executive Officer with regard to Pfizer Inc. in order to destroy that relationship, which process he indicated had already begun, claiming that "the wheels were in motion"; (b) indicating that Allergan Inc. was "next" on "his list of clients" to destroy; and (c) stating that he would use the confidential information he had acquired in his role as CEO to "destroy" AlphaMedica, by ruining its business relations with key clients.

49.    In addition, Paragraph 6(d) of the Shareholders' Agreement provides that "Any breach or threatened breach of any of the covenants in this Section 6 will cause irreparable injury and incalculable damage to the Company or an Affiliate thereof and the Company and such Affiliate shall accordingly be entitled to apply for and obtain injunctive relief for the same in any court of competent jurisdiction in addition to all other remedies which might be available to it or them and each Shareholder agrees not to raise in any such action the defense that plaintiff may have an adequate remedy at law." See Exhibit A at ¶6(d).

50.    Faust has breached all of the covenants enumerated above.

51.    Faust's breaches of those covenants are material, extreme and have been done in a manner intentionally designed to inflict and to continue to inflict maximum damage upon AlphaMedica and its shareholders.

52.    Faust's acts threaten to cause irreparable injury to AlphaMedica's key, multi-million dollar business relationships. Indeed, Faust has stated that his aim to is to end

---

[2] "Affiliate" is defined by Section 6(e) to mean, in part, "any partnership, corporation, association, trust, unincorporated organization or other entity ("Entity") that directly or indirectly controls, is controlled by or is under common control with an Entity."

AlphaMedica's very existence.

53.    Under the Shareholders' Agreement and under applicable law, Plaintiff is entitled to injunctive relief to prevent Faust from taking any such acts.

54.    By reason of the foregoing, AlphaMedica has suffered damages in an amount to be proven at trial, comprised of: (a) the costs, expenses, lost income and profits created by Faust's acts to damage AlphaMedica's business; (b) the damages to AlphaMedica's business relationships; and (c) the damages to AlphaMedica's business reputations, integrity and good name.

## COUNT II
### Breach of Fiduciary Duty

55.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 55 as if set forth herein.

56.    As an AlphaMedica shareholder and as a signatory to the Shareholder Agreement, Faust owes fiduciary duties to his fellow shareholders and to AlphaMedica.

57.    Those fiduciary duties include duties of care and loyalty owed to AlphaMedica.

58.    Faust also owed the same fiduciary duties to AlphaMedica during his tenure as Chief Executive Officer of AlphaMedica. He also owes those duties to AlphaMedica due to his position as a current member of AlphaMedica's board of directors.

59.    Specifically, Faust's fiduciary duties to AlphaMedica obligate him to, among other things, take all necessary actions to protect AlphaMedica's business interests, to safeguard and maintain AlphaMedica's confidential business information, and to protect AlphaMedica's vital business relationships.

60.    By threatening to "ruin" and "destroy" both AlphaMedica's business

10

relationships, as well as the careers of several of AlphaMedica's officers, and by informing the shareholders of actions already taken by him in an effort to destroy AlphaMedica's multi-million dollar business relationship with Pfizer Inc. and Allergan Inc. by using information he obtained while acting as Chief Executive Officer of AlphaMedica, Faust has breached his fiduciary duties owed to AlphaMedica and its shareholders under the Shareholders' Agreement.

61.    Faust's breaches of his fiduciary duties have caused, and threaten to cause, grave damage to AlphaMedica's business.  Faust has, in fact, breached his fiduciary duties with that express purpose in mind.

62.    The foregoing injuries to AlphaMedica were reasonably foreseeable as natural and probable consequences of Faust's conduct.

63.    Plaintiff is entitled to damages for these breaches and compensation for these injuries in an amount to be determined at trial.

### COUNT III
### Tortious Interference with Contractual Relations

64.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 64 as if set forth herein.

65.    AlphaMedica has current, ongoing contracts with Pfizer Inc. and with Allergan Inc.  These contracts generate millions of dollars in revenue for AlphaMedica.

66.    In attempting to persuade Pfizer Inc. and Allergan Inc. to cease dealing with working with AlphaMedica, Faust tortiously interfered with AlphaMedica's contractual relations with those companies.

67.    By reason of Faust's tortious interference, AlphaMedica has been threatened with, and may suffer, loss of business otherwise contractually owed to AlphaMedica.

68.    AlphaMedica is entitled to damages for the breach and compensation for

11

that injury, in an amount to be determined at trial.

WHEREFORE, Plaintiff respectfully demands judgment against Faust as follows:

A.    preliminarily and permanently enjoining Faust and those in concert with him from revealing or disclosing the confidences or secrets of AlphaMedica;

B.    preliminarily and permanently enjoining Faust and those in concert with him from revealing or disclosing materials in any form constituting AlphaMedica confidential business information and AlphaMedica trade secrets;

C.    preliminarily and permanently enjoining Faust and those in concert with him from communicating with the clients of AlphaMedica to affect the business of AlphaMedica;

D.    preliminarily and permanently enjoining Faust and those in concert with him from taking any steps, as threatened by Defendant, to affect the business relationships of AlphaMedica

E.    directing Faust to return to AlphaMedica all computer hardware owned by AlphaMedica currently held by Faust without legal right;

F.    directing Faust to return to AlphaMedica all documents, files, computers and other materials in any form in his possession, custody or control that refer to AlphaMedica's confidential business information;

G.    awarding compensatory damages on Plaintiff's first cause of action in an amount to be determined at trial or inquest;

H.    awarding compensatory and punitive damages on Plaintiff's second and third causes of action in an amount to be determined at trial or inquest;

I.      awarding Plaintiff pre- and post-judgment interest as allowed by law;

J.      awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees; and

K.      granting such other relief as to the Court may seem just and proper.

Dated: New York, New York
      March 21, 2007

WOLLMUTH MAHER & DEUTSCH LLP

By: _____
     David H. Wollmuth
     Stuart Kagen
     Jennifer L. Rudolph

     500 Fifth Avenue
     New York, New York 10110
     Tel: (212) 382-3300
     Fax: (212) 382-0050

     *Attorneys for Plaintiff*

13

Exhibit A

<u>SHAREHOLDERS' AGREEMENT</u>
<u>OF</u>
<u>ALPHAMEDICA, INC.</u>

SHAREHOLDER'S AGREEMENT made as of the 1st day of July, 1999, by and among AlphaMedica, Inc., a Delaware corporation (the "Company"), and those individuals whose names and addresses are set forth on Exhibit A annexed hereto (individually, a "Shareholder" and collectively, the "Shareholders").

<u>Recitals</u>.

1.    The Shareholders are the owners of the number of shares of common stock, without par value, of the Company (the "Common Stock"), representing in the aggregate 100 percent (100%) of the issued and outstanding shares of Common Stock of the Company; and

2.    The Shareholders desire to set forth their agreement with respect to the matters set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein, the parties hereto agree as follows:

1.    <u>Transfer Restrictions</u>.

1.1.    <u>General Restrictions</u>.  Each Shareholder hereby agrees that, so long as this Agreement shall remain in effect, any Shares (as defined herein), or any interest therein, whether now owned or hereinafter acquired, shall not be offered for sale, sold, assigned, bequeathed, transferred (including by will or pursuant to the laws of descent and distribution or otherwise), pledged, encumbered, or otherwise disposed of, nor made subject to a

security interest therein (in each case, a "Transfer") except in strict compliance with the provisions of this Agreement. The term "Shares" shall be deemed to include the shares of Common Stock of the Company, now or hereafter issued and outstanding, as well as each and every class of equity securities as may now or hereafter be authorized for issuance by the Company.

1.2. Prohibited Transfers. Except as otherwise required by law, any Transfer of Shares in violation of this Agreement shall be null and void. The Company shall not record such Transfer on its books and shall not recognize any equitable or other claim to or any interest in such Shares on the part of any person other than the Shareholder from whom such Shares were Transferred.

1.3. Legends. All certificates representing Shares of the Company shall bear a legend in substantially the following form:

> "This certificate and the shares represented hereby may not be offered for sale, sold, bequeathed, transferred (including by will or pursuant to the laws of descent and distribution or otherwise), pledged, encumbered or otherwise disposed of except as provided in a Shareholders' Agreement dated as of July 1, 1999 among the corporation and its shareholders, a copy of which agreement is on file at the office of the corporation. Any purported transfer in violation of such agreement shall be void.

1.4. Transfer Agreements. Each Transfer of Shares by a Shareholder shall be by written agreement, in a form reasonably satisfactory to the Company and its counsel, in which the transferee agrees to hold such Shares subject to, and abide by, all the terms of this Agreement; and counterparts of such agreement, duly executed by the parties thereto, shall be delivered at the consum-

2

mation of such Transfer to the Company. Whether or not such an agreement is so executed and delivered, the transferee of such Shares shall be deemed, by accepting such Shares, to have agreed to hold such Shares subject to all the terms of this Agreement.

1.5. _Transfer of Beneficial Interest_. Any Transfer, whether direct or indirect, of the beneficial interest in Shares of the Company without compliance with the terms hereof with respect to the Shares involved, shall be deemed a prohibited Transfer of Shares and void pursuant to the terms of Section 1.2 hereof.

2. _Rights of First Refusal_.

2.1. _Transfer Notice: Transfer Price_. (a) No Transfer of any shares of Common Stock (except by the laws of descent or distribution) shall be permitted on any terms for a period of eighteen (18) months from the date hereof. Thereafter, if, at any time, any Shareholder receives from any individual or entity a bona fide written offer (which such Shareholder desires to accept), to purchase all of the Shares then owned by such Shareholder, or otherwise proposes to effect a Transfer of Shares, then such Shareholder shall give the Company written notice (the "Transfer Notice") of the name and address of the proposed purchaser or other proposed transferee and a copy of such offer or other proposal, containing all of the terms and conditions thereof, including the name and address of the proposed transferee, the number of Shares proposed to be Transferred (the "Offered Shares) and the price per share which has been offered (the "Transfer Price").

(b)   A "bona fide offer" means an offer made in writing by a prospective purchaser who is not an affiliate of any Shareholder and which provides for the payment of the purchase price set forth in such offer in cash, cash equivalents or deferred installments thereof, all in United States funds.

2.2.   Offer.  The Transfer Notice shall be deemed an irrevocable offer (the "Offer") to sell all, but not less than all, of the Offered Shares to the Company at the lower of the Transfer Price per share and the Agreed Value, as defined in Section 3.5.1(b), below, all on the Alternate Terms, as defined below, and otherwise on the terms and conditions set forth in the Transfer Notice.  The day on which the Company receives notice of the offer shall be deemed to be the date of such Offer ("the Offer Date").

2.3.  Acceptance of the Offer.   (a)   The Company shall notify the offering Shareholder within thirty (30) days of the Offer Date of its acceptance or rejection of the Offer or of its election to purchase the Shares on the Alternate Terms, as that term is defined in Section 2.3(b), below.  If the offering Shareholder does not receive a notice from the Company within such thirty-day period of the Company's desire to purchase all, but not less than all, of the Offered Shares in accordance with the terms of the offer, then the Company shall be deemed to have rejected the Offer, whereupon the offering Shareholder shall proceed in the manner set forth in Section 2.4. If the Offer is accepted, the Offered Shares shall be sold to the Company and the Company shall purchase the offered Shares at the Closing, as described in Section 2.5 below.

(b)  "Alternate Terms" shall have the meaning set forth in Section 3.6.2, below.

2.4. <u>Offer to Shareholders</u>.

2.4.1.    In the event that the Company rejects the Offer, then the offering Shareholder shall transmit a copy of the Transfer Notice to the non-offering Shareholders, which transmission shall be deemed an irrevocable offer to sell all, but not less than all, of the Offered Shares to the non-offering Shareholders <u>pro rata</u> to their then proportionate ownership of the Common Stock upon the same terms previously offered to the Company.  The offering Shareholder shall observe the same formalities required to be observed in Section 2.1 in respect of the Offer to the Company.

2.4.2.    The Shareholders who receive a Transfer Notice pursuant to this Section 2.4 shall notify the offering Shareholder within thirty (30) days after the Offer Date (for purposes of this Section 2.4, the date the Transfer Notice was received by the non-offering Shareholder) of his acceptance or rejection of the offer of his or her election to purchase the Shares on the Alternate Terms.  If the offering Shareholder does not receive a notice within such thirty-day period indicating a desire on the part of the non-offering Shareholders to purchase all, but not less than all, of the Offered Shares in accordance with the preceding sentence, then the Offer shall be deemed to have been rejected, and the offering Shareholder may Transfer the Offered Shares upon the terms set forth in the Transfer Notice subject to the provisions of the last sentence of this Section 2.4.2.  If the Offer is accepted,

5

the Offered Shares shall be sold to the non-offering Shareholders and the non-offering Shareholders shall purchase the offered Shares at the Closing as described in Section 2.5 below. Any Transfer pursuant to the terms hereof shall be subject to the following restrictions: (a) the Shares being Transferred shall be released solely for the purpose of the proposed sale to the proposed transferee, at the Offering Price, and on the terms specified in the Transfer Notice or on the Alternate Terms, as the case may be; (b) the sale shall occur no later than one hundred and eighty (180) days from the Offer Date to the Company, (c) the transferee shall sign a copy of this Agreement, and (d) if the Company is an S Corporation under the Internal Revenue Code of 1986, as subsequently amended, the transferee shall be an eligible holder of S Corporation stock.

2.5. Closing for Share Purchases. The closing of the purchase of the Offered Shares to be purchased by the Company or a Shareholder(s), as the case may be, shall take place within thirty (30) days after the giving of the notice of desire to purchase specified in Sections 2.3 or 2.4. At the closing, the offering Shareholder shall sell, convey, transfer and deliver to the Purchaser full right, title and interest in and to the Offered Shares, free and clear of all liens, security interests or adverse claims of any kind and nature, and shall deliver to the purchaser of the offered Shares a certificate or certificates representing such Shares, in each case duly endorsed for transfer or accompanied by appropriate stock transfer powers duly endorsed, with signatures

6

guaranteed in the customary fashion, and with all necessary transfer tax stamps affixed thereto at the expense of the offering Shareholder. Each purchaser of offered Shares shall deliver to the offering Shareholder in full payment of the purchase price for the Shares purchased by it or him such consideration as is required and described in the Transfer Notice, payable on the terms set forth therein.

3. <u>Mandatory Purchases and Sales</u>.

   3.1. <u>Corporation's Obligation to Purchase Shares</u>.

   3.1.1. <u>Termination Events</u>. Upon the occurrence of any of the following events (each of which is hereinafter called a Termination Event) with respect to any Shareholder, the Corporation (or its Designees) shall purchase, and the Shareholder (or its estate or legal representative) shall sell to the Corporation (or its designees), all of the Shares owned by that Shareholder:

   (a)  the death of the Shareholder;

   (b)  the adjudication of the Shareholder as insolvent or bankrupt or any other act taken by the Shareholder which could reasonably have the foregoing result;

   (c)  the resignation or discharge from employment with the Company of the Shareholder for any reason other than those set forth in Sections 3.1.1(a), (b) and (d) herein; and

   (d)  the Permanent Disability (as defined below) of the Shareholder or his or her retirement at the age of 70.

   3.1.2. <u>Permanent Disability</u>. Permanent Disability shall mean any mental or physical illness or condition rendering a Shareholder incapable of performing his or her normal duties with the Company, notwithstanding any reasonable accommodation which may

be offered to him or her by the Company, for a continuous period of four (4) months or for a period of five (5) months in the aggregate during any continuous twelve (12) month period of the term hereof.

3.1.3.    <u>Terms and Conditions of Sales</u>.  Any purchase of Shares pursuant to this Section 3.1 shall be subject to the terms and conditions set forth below in Sections 3.2 through 3.7.

3.1.4.    <u>Limitation on Obligation</u>.  Nothing in this Section 3.1 shall be deemed to permit the Company (or its designees) to purchase Shares hereunder if an option to purchase Shares pursuant to a right of first refusal granted by Section 2 herein is pending.

3.2.    <u>Notice of Purchase</u>.

3.2.1.    <u>Sending of Notice</u>.  If a Termination Event occurs, the Company shall send a notice of purchase (hereinafter called the "Notice of Purchase") with respect to all of the Shares owned by the Shareholder who is the subject of such Event, such Notice to be sent to the subject Shareholder (which term shall include his legal representatives in the event of his death or disability).  The Notice of Purchase shall be given within ninety (90) days from and after the date on which the Company acquires actual knowledge of a Termination Event.

3.2.2.    <u>Content of Notice</u>.  The Notice of Purchase shall specify: (a) that the Company (or its Designee) will purchase all of the Shares owned by the Shareholder; (b) the purchase price per Share (as determined in accordance with the Section 3.5) of any Shares to be purchased and the amount to be paid by each purchaser

8

of Shares; and (c) the date or dates on which the closing of such purchase is to be held (the "Closing"), which date or dates shall be not more than thirty (30) days after the date on which the Notice of Purchase is given.

3.3.  Designation of Purchasers.  Whenever the Company shall be required to purchase any Shares pursuant to Section 3.1, the Company may designate such person or persons as a purchaser or purchasers of all or any part of such Shares as it may desire.  If any person so designated shall default in his obligation to deliver payment for shares as required by this Agreement or shall default in his obligations under any promissory note given in payment for Shares purchased by him, the Company may either designate another purchaser or may pay the purchase price for the Shares in his stead.

3.4.  Status of Shares Purchased.  In the event of a purchase of Shares pursuant to Section 3.1, then, regardless of when the purchase price of the Shares is paid, (a) all rights of the Shareholder from whom such Shares are to be purchased as a holder thereof, other than the right to receive payment of the purchase price of such Shares at the time and place and in the amount and form (whether in cash, evidences of indebtedness, or both) determined as provided in this Agreement, shall be deemed to have terminated as of the day of the Termination Event (the "Termination Date"); and (b) such Shares shall be deemed to be no longer outstanding for any purpose, or, if purchased by a purchaser or purchasers other than the Company, shall be deemed to be owned by

9

such purchaser or purchasers for all purposes, from and after the Termination Date. Each of the Shareholders hereby agrees that, as to the Shares sold, from and after the Termination Date, the Shareholder whose Shares have been sold shall have no interest in the profits, losses, or income of the Company, whether or not such profits, losses or income are in respect of events occurring prior to the Termination Date, and no right to participate in the Company's affairs.

3.5.  Purchase Price.

3.5.1. (a) The purchase price for any shares to be purchased pursuant to the provisions of Section 3.1.1(a) shall be equal to 100% of Agreed Value, as hereafter defined, of such Shares. The purchase price for any shares to be purchased pursuant to the provisions of Sections 3.1.1(b) and (c) shall be equal to seventy-five percent (75%) of Book Value, as hereafter defined, of such shares. The purchase price for any shares purchased pursuant to the provisions of Section 3.1.1(d) shall be equal to one hundred percent (100%) of Book Value, as hereafter defined, of such shares. If the conditions set forth in Section 3.5.2 have been met, the applicable price shall be calculated in accordance with the terms thereof.

(b)  Agreed Value shall mean the value of the shares of stock of the Company which is fixed by a certificate of agreed value (the "Certificate") signed by each of Todd Retallack, Kelli Mooney, Andrew Galler and Michael Faust (the "Deciding Shareholders") and filed with the Company not less than annually,

10

commencing on the effective date of this Agreement. The Agreed Value set forth in such certificate shall be reasonable in light of the then circumstances, financial and otherwise, of the Company and shall be conclusive as to the value of the stock for purposes of this Section 3.5.1. In no event shall a Certificate be effective unless signed by all of the Deciding Shareholders. The Deciding Shareholders may at any time execute a new Certificate which shall automatically replace all prior Certificates, and in no event shall any but the last Certificate be effective for the purposes herein specified. No Certificate, however, shall be effective for any purpose if it was executed more than twelve (12) months before the date for the determination of Agreed Value occasioned by the occurrence of any of the events set forth in Sections 3.1.1(a)-(d) hereof.

3.5.2     (a)     If a Certificate has not been prepared in accordance with the requirements of Section 3.5.1(b), the purchase price for the Shares shall be as follows:

(i)     if the obligation arises under Section 3.1.1(a), the purchase price shall be equal to 100% of the Book Value of such Shareholder's Shares, calculated as at the end of the Company's fiscal quarter next preceding the date of the Termination Event by the Company's regularly employed accountants in a manner consistent with the methods used by such accountants in preparing the Company's audited or reviewed financial statements for the Company's fiscal year next preceding the date of the Termination Event (as so calculated, the "Book Value");

11

(ii)   if the obligation arises under Sections 3.1.1(b) or (c), the purchase price shall be equal to 70% of the Book Value;

(iii)  if the obligation arises under Sections 3.1 (d), the purchase price shall be equal to 100% of the Book Value of the Shares.

(b)  In addition to payment for his shares, a Shareholder who is under a Permanent Disability shall be entitled to receive:  (x) as salary continuation, his full compensation in effect at the date of the Termination Event from that date until the earlier of the date of the first payment to the applicable shareholder pursuant to any policy of disability insurance maintained for the benefit of such Shareholder by the Company (the "Disability Payment Date") or the date 60 days after the Termination Event, such amount payable as had regularly been paid to the disabled Shareholder prior to the date of the Termination Event; (y) as additional salary continuation, an amount equal to the difference between the total compensation paid by the Company to the remaining Shareholder during the period commencing on the Disability Payment Date and ending on the date twelve months thereafter and twice the amount paid (or, if the Disability Policy is not then in force, the amount that would have been paid pursuant to the terms thereof) to the disabled Shareholder pursuant to the Disability Policy during the same period, such amount payable monthly commencing on the Disability Payment Date; and (z) as a severance payment, an amount equal to the Company's net profits during each of the seven fiscal years following the date of the

12

Termination Event multiplied by the product of 5% and a fraction, the numerator of which is the number of Shares owned by the disabled Shareholder and purchased pursuant to the provisions hereof and the denominator of which is the then total number of issued and outstanding Shares of the Company; said net profits to be calculated before distribution for any compensation paid to the remaining Shareholders and otherwise in accordance with the Company's audited or reviewed financial statements for each of such fiscal years, and payable within 60 days after the end of each such fiscal year.

3.6. Payment of Purchase Price. The terms of payment for any Shares purchased pursuant to this Section 3 shall be the following:

3.6.1 (a) the Purchaser shall deliver to the selling Shareholder or his legal representative in full payment of the purchase price for the Shares purchased a certified check payable to the order of the selling Shareholder or his representative in an amount equal to ten percent (10%) of the total purchase price as determined pursuant to Section 3.5 above and shall deliver in payment of the balance thereof a promissory note payable in equal quarterly installments over ten years including interest thereon at the rate set by the Commissioner of the Internal Revenue Service for the computation of imputed interest. Payment of amounts due under such note shall be secured by a pledge of the stock so purchased in form and terms reasonably satisfactory to the selling Shareholder or his representative. The payment terms set forth herein are collectively referred to as the "Alternate Terms".

13

(b)  Nothing contained in this Section 3.6 shall be construed to prevent the Company (or its designees) from paying any of the consideration for the purchase of Shares in a manner not provided for herein, if mutually agreed to in writing by the Purchaser and the Shareholder from whom such Shares are to be purchased.

3.7.  Delivery of Certificates.  Certificates evidencing all Shares which are being purchased pursuant to Section 3.1 shall be delivered to the Company at its principal office and the Company shall maintain temporary custody of Shares for any purchaser other than the Company, at the time of the first payment due hereunder, such certificates to be free and clear of all liens, security interests or adverse claims of any kind and nature, duly endorsed for transfer or accompanied by one or more duly executed stock powers, and with all stock transfer taxes paid or provided for by the seller.

4.  Operation of the Company; Voting of Shares.  (a)  During the term hereof, each Shareholder agrees to vote the shares owned by him (i) to maintain the number of directors constituting the entire Board of Directors at four (4) persons, and (ii) in favor of the election of each of the Deciding Shareholders as directors of the Company.  Each Shareholder agrees to cause the following persons to be elected to offices set forth opposite his or her name:

| Name | Offices |
|------|---------|
| Michael Faust | Chairman and Managing Director |
| Todd Retallack | President and Managing Director |

14

| | |
|---|---|
| Kelli Mooney | Vice President |
| Andrew Galler | Secretary |
| Michael Faust | Treasurer |

Each of the Shareholders shall be entitled to receive the salary and other benefits to the extent determined by the Board of Directors of the Company.

(b)    For so long as this Agreement is in effect, if any Shareholder fails or refuses to vote his Stock as provided in this Agreement, without further action by that Shareholder, the other Shareholders, jointly and severally, shall have an irrevocable proxy to vote in accordance with this Agreement all the Shares of the failing or refusing Shareholder and each Shareholder hereby grants to the other Shareholders such irrevocable proxy, which each Shareholder agrees is coupled with an interest.

5.    Investment Representations.  Each Shareholder represents that he acquired Shares for investment and not for resale or distribution to others, but solely for such Shareholder's own account and each Shareholder agrees that he will not sell or otherwise distribute such Shares or any interest therein, unless they are registered under the Securities Act of 1933 and any applicable state securities laws, unless an exemption from such federal and state laws is available.  Each Shareholder agrees that he will not transfer Shares unless the transferee thereof executes and delivers to the Company an investment representation letter, executed by such transferee, containing representations substantially similar to those set forth in this Section 5.

15

6.  <u>Non-Competition; Non-Solicitation; Confidentiality</u>.  (a) Each
Shareholder agrees that for so long as he owns shares of the Company
or is employed thereby and for 12 months after the later of (i) the
date on which he ceases to be a Shareholder and (ii) the date on
which he ceases to be an employee, he will not directly or
indirectly own, operate, join, control, engage in, or participate in
the ownership, management, operation or control of, or be a director
or an employee of, or a business consultant to, any business, firm,
or corporation the business of which is similar to or competes with
the business of the Company or any of its Affiliates as conducted
during the term of such Shareholder's employment; provided, however,
that the provisions of this section shall not apply to investments
by a Shareholder in shares of stock traded on a national securities
exchange or over-the-counter market which shall have an aggregate
market value, at the time of acquisition, of less than $50,000 and
which shall constitute less than one percent of the outstanding
shares of such stock.

(b)  Each Shareholder agrees that in the event of the termina-
tion of his employment with the Company or any Affiliate thereof for
any reason or the sale of his or her Shares, such Shareholder shall
not, prior to the third anniversary of the last to occur of his
termination of employment or sale of his shares, directly or
indirectly, (i) solicit any client of the Company or any Affiliate
at the time of such Shareholder's termination or during the six
months prior thereto; or (ii) render services which are within the
scope of the Company's or any Affiliate's business to any such

16

client as an employee, consultant, director, officer or agent of a competitor of the Company or any Affiliate; or (iii) solicit for purposes of employment any employee of the Company or any of its Affiliates, or induce any such employee to terminate such employee's employment with the Company or any Affiliate.

(c)  Each Shareholder agrees that both during his or her employment and after termination thereof, each Shareholder will not do any act which is intentionally detrimental to the reputation of the Company or any of its Affiliates, such as making derogatory or disparaging remarks about the Company or its Affiliates or their employees; and each Shareholder will not reveal or use confidential or proprietary information about the Company, or any of its Affiliates or its clients obtained by the holder while an employee.

(d)  Any breach or threatened breach of any of the covenants in this Section 6 will cause irreparable injury and incalculable damage to the Company or an Affiliate thereof and the Company and any such Affiliate shall accordingly be entitled to apply for and obtain injunctive relief for the same in any court of competent jurisdiction in addition to all other remedies which might be available to it or them and each Shareholder agrees not to raise in any such action the defense that plaintiff may have an adequate remedy at law.

(e)  "Affiliate" shall mean any partnership, corporation, association, trust, unincorporated organization or other entity ("Entity") that directly or indirectly controls, is controlled by or is under common control with an Entity.  As used in the definition

17

of "Affiliate," the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an Entity, whether through ownership of voting securities, by contract or otherwise. The term "control" for purposes of a joint venture means the possession by an Entity of the ownership of securities constituting more than twenty-five (25%) of the outstanding voting securities or equity interests of the joint venture and a determination by the Company that the Entity's interest therein is sufficient to be deemed control.

7.    General

   7.1.    No Waiver, Remedies Cumulative. No action taken by any party hereto shall be deemed to constitute a waiver by such party of compliance with any covenant or agreement contained in this Agreement. No course of dealing between the parties hereto and no failure or delay on the part of any party hereto in exercising any right, power, or privilege hereunder shall operate as a waiver thereof; and no single or partial exercise of any right, power or privilege shall preclude any other or future exercise thereof or the exercise of any other right, power or privilege. The rights and remedies provided herein are cumulative and not exclusive of any right or remedies which the parties would otherwise have. The waiver of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

   7.2.    Entire Agreement, Amendments, Termination. (a) This Agreement constitutes the entire agreement, and supersedes all prior agreements and understandings, oral and written, between the parties

hereto with respect to the subject matter hereof. No modification, amendment or waiver of any provision of this Agreement shall be effective unless in writing and signed by the parties against whom enforcement thereof is sought; and any such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

(b) This Agreement shall terminate on its tenth anniversary and shall terminate earlier upon the effectiveness of a registration statement filed by the Company pursuant to the Securities Act of 1933, as amended, and the sale of common stock or other equity securities of the Company pursuant thereto.

7.3. _Specific Performance_. The parties hereto acknowledge that the Shares are unique and that there may be no adequate remedy at law for that failure of any party to perform his obligations hereunder with respect to such Shares. In the event of such failure, any party hereto shall have the right, in addition to any other rights such party may have, at law, in equity or otherwise, to specific performance of any and all such other party's obligations under this Agreement.

7.4. _Notices_. Except as otherwise specified herein, all notices, requests, demands, consents, exercises of options, and other communications required or permitted to be given or made under this Agreement shall be in writing and shall be deemed to have been duly given or made when received, either hand delivered, telexed or mailed, express, registered or certified first class mail, postage

prepaid, return receipt requested, to the party to whom the same is so given or made.

7.4.1.   If to the Company, to:

AlphaMedica, Inc.
Shadowbrook
821 North Broadway
Irvington, New York  10533

With a copy to:

Pirro, Collier, Cohen & Halpern, LLP
One North Lexington Avenue
White Plains, New York  10601
Attention:  David A. Newberg, Esq.

7.4.2.   If to any Shareholder:

The address listed on Schedule A

7.4.3.   If to any party, to such other address as such party shall have specified by notice to the other parties.

7.5.   <u>Binding Effect: Benefits</u>.  This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the parties hereto and their respective successors, assigns, heirs and legal representatives.

7.6.   <u>Separability</u>. The invalidity of all or any part of any Section of this Agreement shall not render invalid the remainder of such Section or of this Agreement.  If any provision of this Agreement is so broad as to be unenforceable, such provision shall be interpreted to be only so broad as is enforceable.

7.7.   <u>Headings</u>. The headings of this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

20

7.8. <u>Execution in Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall, when executed, be deemed it be an original and all of which shall be deemed to be one and the same instrument.

7.9 <u>Governing Law</u>. This Agreement and the rights and obligations of the parties hereunder shall be governed by, and construed and interpreted in all respects in accordance with, the laws of the State of Delaware.

7.10 <u>Subchapter S Status</u>. The parties acknowledge that the Company has elected to be taxed for Federal and state income tax purposes in accordance with Subchapter S of the Internal Revenue Code of 1986, as amended (the "Election"). In furtherance thereof, the parties agree that, in the event the consummation of any of the transactions contemplated by any provision of this Agreement would, in the opinion of counsel to the Company or any Shareholder, have the effect of terminating the Election, such transaction shall not be consummated without the written consent of the parties hereto, who shall use their best efforts to take whatever actions may be necessary to preserve the Election and to give effect to the economic effect of the transaction then at issue.

IN WITNESS WHEREOF, the undersigned have executed this Agreement or caused this Agreement to be executed on their behalf as of the date first above written.

ALPHAMEDICA, INC.

By: _____
Title: _____

_____
Todd Retallack

_____
Kelli Mooney

_____
Andrew Galler

_____
Michael Faust

_____
Vincent Tozzi

_____
Kerri Riccardo

_____
Andrew Minninger

_____

EXHIBIT A


SHAREHOLDER NAME
 AND ADDRESS                                      NUMBER OF SHARES


Todd Retallack                                           500
213 South Broadway
Nyack, NY  10960

Kelli Mooney                                             500
116 Seacord Road
New Rochelle, NY  10804

Andrew Galler                                            500
100 Travis Corners Road
Garrison, NY  10524

Michael Faust                                            500
12 Ivy Place
Upper Saddle River, NJ  07458

Vincent Tozzi                                            115
Shadowbrook
821 North Broadway
Irvington, New York 10533

Kerri Riccardo                                           115
24 Hubbell Place
Milford, Connecticut 06460

Andrew Mininger                                          57.5
333 East 69th Street, Apt. 4G
New York, New York 10021

Unanimous Written Consent of
the Shareholders of
AlphaMedica, Inc.

The undersigned, being all of the Shareholders of AlphaMedica, Inc., a Delaware corporation, hereby consent, pursuant to Section 228(a) of the Delaware Corporations Law, to the taking of the actions described in the resolutions set forth below, and such resolutions shall constitute resolutions and actions duly adopted and taken by the Shareholders, without a meeting, as of June 30, 2001:

1.    RESOLVED, that the Amendment to Shareholders' Agreement of AlphaMedica, Inc. attached hereto as Exhibit A is approved in all respects.

2.    RESOLVED, that the Shareholders will take any and all steps and execute and deliver the Amendment and any and all instruments necessary or desirable to effectuate the foregoing resolution.

Shareholders of AlphaMedica, Inc.

_____
Kelli Mooney

_____
Andrew Galler

_____
Michael Faust

_____
Kerri Riccardo

_____
Christine Manning

_____
Michael Kroha

_____
William Stroemer

_____
Vincent Tozzi

EXHIBIT A

## AMENDMENT TO SHAREHOLDERS' AGREEMENT OF
## ALPHAMEDICA, INC.

This AMENDMENT TO SHAREHOLDERS' AGREEMENT OF ALPHAMEDICA, INC. is made and entered into as of the 30th day of June 2001 by the undersigned.

The parties hereby agree that Exhibit A of the Shareholders' Agreement of AlphaMedica, Inc. dated as of July 1, 1999 (the "Agreement") is hereby amended in its entirety to be the Exhibit A attached hereto and made a part hereof.

All other terms of the Agreement not inconsistent with this Amendment to Shareholders' Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to Shareholders' Agreement of AlphaMedica, Inc. to be executed as of the day and year first above written.

ALPHAMEDICA, INC.

By: _____
Authorized Signatory

_____
Kelli Mooney

_____
Andrew Galfer

_____
Michael Faust

_____
Kerri Riccardo

_____
Christine Manning

_____
Michael Kroha

_____
William Stroener

_____
Vincent Tozzi

## EXHIBIT A

| SHAREHOLDER NAME AND ADDRESS | NUMBER OF SHARES |
|---|---|
| Kelli Mooney<br>116 Seacord Road<br>New Rochelle, New York 10804 | 594.7494 |
| Andrew Galler<br>100 Travis Corners Road<br>Garrison, New York 10524 | 594.7494 |
| Michael Faust<br>12 Ivy Place<br>Upper Saddle River, New Jersey 07458 | 594.7494 |
| Kerri Riccardo<br>24 Hubbell Place<br>Milford, Connecticut 06460 | 183 |
| Christine Manning<br>257 Country Club Drive<br>Oradell, New Jersey 07649 | 183 |
| Michael Kroha<br>c/o AlphaMedica, Inc.<br>220 White Plains Road, 4th Floor<br>Tarrytown, New York 10591 | 45.75 |
| William Stroemer<br>c/o AlphaMedica, Inc.<br>220 White Plains Road, 4th Floor<br>Tarrytown, New York 10591 | 45.75 |
| Vincent Tozzi<br>253 Elizabeth Street, Apartment 6<br>New York, New York 10012 | 45.75 |

Index No.:  4887 - 07

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

---

ALPHAMEDICA, INC.

                                        Plaintiff,

                    -against-

MICHAEL K. FAUST

                                        Defendant.

---

SUMMONS AND COMPLAINT

---

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300


Attorneys for Plaintiff
AlphaMedica, Inc.